# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WOLFGANG S. BOERNERT** | : | **No. 3:06cv362** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **PATRICK B. RESPET, M.D., and** | : | |
| **ORTHOPAEDIC ASSOCIATES OF** | : | |
| **ALLENTOWN, LTD.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

_____Before the court are plaintiff's motion for delay damages and post-judgment interest (Doc. 76) and defendants' motions for relief from judgment[1] (Doc. 79, 82, 99).

**Background**

This case arose out of a snowmobile accident that occurred at around 8 p.m. on February 29, 2004 at Alpine Mountain Ski Area. On that date, plaintiff, who was director of the Alpine Mountain Ski Patrol, was thrown from a snowmobile he was operating. He flew off the machine and into a tree, shattering his left femur. Plaintiff received treatment for this injury from Defendant Dr. Patrick B. Respet. Dr. Respet performed several surgeries on plaintiff, but his the fracture to his femur had not healed at the time of trial.

---

[1]Documents 79 and 82 provide the same grounds for relief.

On August 11, 2005, plaintiff filed suit in the United States District Court for the Eastern District of Pennsylvania. (See Doc. 1-1). In that complaint, plaintiff alleged negligence, carelessness and/or recklessness against Defendant Alpine Mountain. This conduct, he contended, was the cause of his injuries. On February 16, 2006, plaintiff filed an amended complaint which added Defendants Respet and Orthopaedic Associates of Allentown. (See Doc. 1-17). While plaintiff repeated his charges against Alpine Mountain, he also alleged that the new defendants were negligent, careless and/or reckless in their treatment of his injuries. He contended that Dr. Respet's treatment of his broken femur was negligent, and this negligence prevented a union of the fracture and left him permanently disabled. On January 26, 2006, Judge Anita J. Brody ordered this case transferred to the United States District Court for the Middle District of Pennsylvania. (See Doc 1-19).

After this court denied Defendant Alpine Mountain's motion for summary judgment (Doc. 33) and the court scheduled trial on the matter, the plaintiff settled his case against that defendant. The case then proceeded to trail against Defendants Respet and Orthopaedic Associates of Allentown. After a three-day trial, the jury returned a verdict in the plaintiff's favor. The jury found Defendant Respet negligent in his treatment of plaintiff, and concluded that plaintiff's injuries were the result of this negligence. The jury awarded plaintiff $1,840,564 in damages for past medical expenses, past and future economic harm, and future non-economic damages. After the trial, defendants filed motions for relief from the judgment (Docs.

79, 82), and the plaintiff filed a motion to amend and correct the judgment (Doc. 79) to reflect delay damages and interest. The defendants filed a supplemental motion for summary judgment after the court reporter filed the official transcript in the case. (Doc. 99). The parties then briefed the issues, bringing the case to its present posture

**Jurisdiction**

Plaintiff is a citizen of New Jersey and defendants are either citizens of Pennsylvania or Pennsylvania corporations with their principal place of business in the Commonwealth. The amount in controversy exceeds $75,000. Accordingly, we have jurisdiction pursuant to 42 U.S.C. § 1441.

**Discussion**

**a. Defendants' Motion**

Defendants challenge certain evidentiary rulings made by the court during the trial, as well as the sufficiency of the evidence to support the jury's verdict.

**i. Judgment As a Matter of Law**

Defendants seek judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on several grounds. "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)(1)). The court grants this motion "only if 'viewing the evidence

in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could find liability.'" Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).  Courts apply the same standard to motions made before the jury verdict pursuant to Rule 50(a) and after the jury verdict made pursuant to Rule 50(b).  See McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995).

### a.  Failure to Offer Competent Expert Testimony Establishing a Causal Connection Between Dr. Respet's Conduct and Plaintiff's Injuries

Defendants argue that plaintiff's medical expert testified that 5% of injuries similar to plaintiff's do not heal, whatever care the patient received.  Because of this testimony, defendants argue, the expert's testimony does not establish that the injuries plaintiff suffered were a result of Dr. Respet's treatment.  Thus, plaintiff did not establish causation, one of the elements of his medical malpractice claim, and defendants are entitled to judgment pursuant to Rule 50.

The dispute at trial was largely over the propriety of Dr. Respet's decision in inserting and then removing different screws and rods in his effort to aid the healing of plaintiff's fractured femur.  Dr. Irving Ratner testified at trial as an expert on orthopaedic surgery for the plaintiff.  (Official Transcript of Proceedings Held on October 29, 2008 (hereinafter "T. Vol. II") at 24).  Plaintiff, the doctor testified, had a suffered a fracture of the femur on February 29, 2004.  (Id. at 28).  Ratner

4

characterized this fracture as "a subtrochanteric fracture," involving the "bone right below the major attachments for the upper muscles of the thigh and the hip." (Id.). The fracture "was a grade four, which means that it was comminuted into more than four or five fragments, and both the medial and the lateral walls were fractured and broken so that there was a lot of loose bone between the head and neck complex and the rest of the fracture." (Id. at 29). The injury was thus "complex" and the fracture a "bad" one. (Id.). Such an injury required "a lot of attention" to insure proper healing. (Id.). A doctor who chose surgery had to be sure that the operation was "done correctly to give the patient the best opportunity to heal the fracture and get on with their life." (Id. at 29-30).

Dr. Respet first treated plaintiff by operating on him and inserting "an intramedullary nail . . . which he locked by screws that go through the bone and through holes in the plate." (Id. at 30). This "static locking mechanism" was meant to insure that "the bone can't move or rotate because the rod has the screws across that hold it in place and that provides stable fixation." (Id.). A screw inserted near the knee joint protruded into soft tissue on the inside of the knee, and plaintiff complained of pain. (Id.). Dr. Respet performed another operation on April 8, 2004. (Id.). He removed "the bottom screw, essentially releasing the fracture control from the bottom so that the bottom of the thigh bone could rotate or telescope up or down depending on where it was going to go." (Id.). After Dr. Respet performed that operation, the femur "telescoped," moving up so that "fracture fragments were

5

pushed out further to the side, and then ultimately the end of the nail came out through the bottom of the thigh bone and entered into the joint." (Id. at 31). That situation required a third operation where "Dr. Respet reduced the telescoping, corrected the rotation to the best of his ability and put two additional locking screws at the bottom." (Id.). After this procedure, plaintiff's fracture did not seem to heal. (Id.). Plaintiff saw several other doctors thereafter, and underwent various treatments. (Id. at 31-32). At the time of trial, over four years after the accident, another surgeon had discovered that the fracture had not healed. (Id. at 32). Plaintiff continued to use a bone stimulator 24 hours a day in an attempt to promote healing of the fracture. (Id.).

Doctor Ratner offered his opinion on the medical treatment plaintiff received. He testified that all of his opinions were rendered with "a reasonable degree of medical certainty." Dr. Ratner testified that Dr. Respet had deviated from the standard of care in several instances, including his placement of the rod and screw in the initial operation and the removal of the distal screw that protruded too far without replacing it. (Id. at 44-45, 48-49). Dr. Ratner was particularly critical of Dr. Respet's decision to remove the uncomfortable screw without replacing it, only later to pull the bone out again and put new screws in. (Id. at 55). Dr. Ratner explained that such treatment disrupted the healing process and "reduced the chance of good primary healing in this type of fracture." (Id.). While "95 percent of these fractures in this area will heal. There may be some shortening, there may be some angulation,

6

but they heal with intramedullary fixation. Five percent of them or so, the literature varies, will go on to develop a nonuion and have to have a second repair done." (Id.). For a doctor, "if you do it right the first time and you stabilize the fracture and you don't let it move, it will heal and you're in that 95 percent chance of healing." (Id. at 56). Disrupting the healing process, however, can "reduce the healing of the fracture percentages maybe even below 50 percent." (Id.). Dr. Ratner concluded that "that is what happened here." (Id.). "[T]he manipulation of the fracture and the telescoping of the fracture disrupted the normal process of healing and maturation of the callus and led to the development of the nonunion which necessitated further surgery." (Id.). Thus, "[t]he stage was set initially for the nonunion to develop, in my opinion, by what Dr. Respet had to do because of what he didn't do right the first time." (Id. at 57).

To set forth a prima facie case of medical malpractice, "the plaintiff must establish (1) a duty owed by the physician to the plaintiff (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." Mitzelfelt v. Kamrin, 584 A.2d 888, 892 (Pa. 1990). In addition, a plaintiff must also provide testimony from an expert witness "who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered."

Id.

The question in this case is whether plaintiff provided sufficient expert evidence to establish Dr. Respet deviated from accepted standards, and that this deviation was the proximate cause of plaintiff's harm. Defendants argue that Dr. Ratner's testimony that 95% of injuries similar to plaintiff's heal with one surgery provides a "clear implication . . . that in 5% of the cases, fractures like those sustained by Mr. Boernert do not heal," even when a patient's care was within acceptable professional standards. (Motion (Doc. 99) at ¶ 4). Moreover, defendants contend, "Dr. Ratner never provided an opinion, with a reasonable degree of medical certainty, that Dr. Respet was negligent and that his negligence, rather than the inherent nature of the accidental trauma, caused the non-union." (Id. at ¶ 5).

The court finds that Dr. Ratner provided an opinion rendered with a reasonable degree of medical certainty that plaintiff's injuries related to his non-union were a result of Dr. Respet's negligence. The evidence related above demonstrates that Dr. Ratner indicated that Defendant Respet's treatment of plaintiff deviated from the standard of care in a way that made the union of the fracture less likely than if the treatment had met the standard of care. He based this assessment on his examination of the medical evidence of plaintiff's treatment, as well as his expertise in orthopaedic surgery. Defendants' claim that Dr. Ratner failed to state an opinion on whether his conduct was the proximate cause of plaintiff's injuries is not borne out by the testimony. On cross examination, for example, Dr. Ratner testified that

plaintiff's fracture "occurred in an otherwise healthy man with every reason in his body to heal the fracture, and had the surgery been done correctly from the very beginning, my opinion is that Mr. Boernert would have been able to ski again and he would have been able to fly a helicopter." (T. Vol. 2 at 71). Given this evidence, a reasonable jury could conclude that Dr. Respet violated the standard of care, and that this violation was the proximate cause of plaintiff's injuries.

This case is like Mitzelfeld v. Kamrin, cited above. In that case, plaintiff was confined to a wheelchair and unable to care for herself after surgery left her partially paralyzed. Mitzelfeld, 584 A.2d at 890. At trial, plaintiff's expert testified that while most patients do better after an operation such as the one performed on plaintiff, around twenty percent of those patients would emerge weaker after the operation regardless of whether malpractice occurred. Id. at 891. The court noted that in general a plaintiff must establish that defendant's deviation from the standard of care was the proximate cause of her injuries. Id. at 892. "In many cases," the court emphasized, "this is not a problem for the plaintiff." Id. Some cases, though, "make this an impossible standard. These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm." Id. In those cases, the court is to "employ a two part test." Id. at 894. First, the court must "determine whether the expert witness for the appellants could testify to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the appellant suffered." Id. If the plaintiff meets

this burden, then the jury is to decide whether "the acts of the defendant were a substantial factor in bringing about the harm."

The court in Mitzelfelt found that the plaintiff had introduced sufficient evidence to show that "(1) the standard of care deviated from good and acceptable medical practice, (2) that such deviation increased the risk of harm to the patient, and (3) that such harm was actually suffered." Id. at 895. The court therefore decline to reverse the jury's verdict. The facts are similar in this case. Plaintiff introduced evidence to demonstrate that Dr. Respet, in deciding not to secure the fracture after remove the screw from the initial surgery, violated the standard of care. Dr. Ratner testified that there was a 5% chance that plaintiff's fracture would not have healed, even if Dr. Respet had observed the proper standard of care. Dr. Ratner also testified that plaintiff's chances of healing were diminished because of Dr. Respet's failings. The jury then decided that Dr. Respet's actions were a substantial factor in bringing about plaintiff's harm, despite the fact that there was a small chance his injury may not have healed with any treatment. Defendants's motion will be denied on this point, since "[a] defendant cannot escape liability because there was a statistical possibility that the harm could have resulted without negligence." Id. at 894.

### b. Permanency of plaintiff's injuries and whether Defendant Respet caused them

Defendants also argue that plaintiff failed to provide expert testimony to prove that plaintiff would not be able to return to his previous activities and had suffered

permanent injuries.  Defendants argue that any testimony on the permanency of these damages from Dr. Ratner was unduly speculative and lacked sufficient factual foundation.   As such, judgment should be rendered for the defendants in this case.

Plaintiff's counsel questioned Dr. Ratner at trial about his opinion of whether plaintiff's injuries were permanent.  (T. Vol. 2 at 59-60).  Dr. Ratner had earlier testified about the nature and extent of plaintiff's injuries, the treatment he had received for them, and the lack of union that he still experienced in the fracture after four years of treatment.  Dr. Ratner testified that plaintiff "has limitations."  (Id. at 60). A physical examination revealed that plaintiff's "leg is still short," and that he had continued tenderness from surgery and permanent scars from earlier operations. (Id.).  Though every patient differed, Dr. Ratner had "pretty strong feelings" that plaintiff would never return to his work as a medevac pilot or his earlier activity with the ski patrol.  (Id.).  Asked about plaintiff's future working capacity, Ratner reported that plaintiff could probably "work in a sedentary position, which is sitting down primarily . . . where he did not do any heavy lifting or bending or carrying where he needed to stabilize his leg."  (Id. at 61).  Plaintiff could not use any foot controls on machinery like forklifts or airplanes.  (Id.).  In discussing these limitations, Ratner concluded that "[t]here are lots of things that have to be taken into consideration. They are permanent changes."  (Id.).  Asked to define what he meant by permanent, Dr. Ratner explained that plaintiff was "[n]ever going to get better."  (Id.).

The court will reject this portion of the defendants' motion as well.  The

11

evidence indicates that Dr. Ratner based his opinion on an examination of plaintiff and of his medical records, as well as his experience in treating such patients. Dr. Ratner noted that plaintiff had, despite years of treatment, not yet seen substantial healing in his femur and continued to suffer from debilitating injuries. Such an opinion was not unduly speculative, and to treat it as such would require doctors to obtain a level of certainty that is not inherent to the medical profession. The jury could reasonably base its opinion on that testimony, and the court will not disrupt the jury's verdict on those grounds.

### ii. New Trial

Defendants also seek a new trial on several grounds. Federal Rule of Civil Procedure 59(a)(1)(A) provides that a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). The Third Circuit Court of Appeals has counseled that "the district court ought only to grant a new trial" because the verdict was against the weight of the evidence and "where 'a miscarriage of justice would result if the verdict were to stand.'" Fineman v. Armstrong World Indus., 980 F.2d 171, 211 (3d Cir. 1992). Moreover, a court should order a new trial when "'the verdict, on the record, cries out to be overturned or shocks our conscience.'" Wilburn v. Maritrans GP, 139 F.3d 350, 364 (3d Cir. 1998) (quoting Williamson v. CONRAIL, 926 F.2d 1344, 1353 (3d Cir. 1991)). Courts follow this standard because "[I]n deciding an appeal from a judgment entered after a jury trial, we must respect the

jury's important role in our legal system and therefore may not substitute our view of the evidence for that of the jury." Grazier v. City of Philadelphia, 328 F.3d 120, 129 (3d Cir. 2003).

Defendants contend that the court erred in allowing plaintiff's counsel to question Defendant Respet on whether he explained to plaintiff the risks of surgery or obtained plaintiff's informed consent for that surgery. Such material, defendants assert, was both irrelevant and highly prejudicial. The question in the case was whether treatment fell below the standard of care, not what Respet said to plaintiff before the surgery. Plaintiff did not raise a cause of action for failure to provide informed consent, and thus questions about the form were irrelevant to the case and the court should have prevented plaintiff's counsel from asking them. Moreover, a jury was likely to be misled and inflamed by the question, and the court should have excluded the evidence as unduly prejudicial pursuant to Federal Rule of Evidence 403.

During Dr. Respet's testimony, plaintiff's counsel questioned the defendant about his conversations with the plaintiff prior to the operation to remove a screw from his fracture. (T. Vol. 3 at 44). Counsel asked Dr. Respet if he had obtained an "informed consent" form from the plaintiff. (Id.). The defendant related that he had. (Id.). Plaintiff's counsel then asked Respet if he had heard his expert's testimony "that collapsing of this fracture or movement of this fracture was a standard risk of what you did?" (Id.). Defendant agreed that Dr. DeLong had testified to that effect.

(Id.).  Defense counsel objected to the question, pointing out that "[t]here is no claim for informed consent in this case."  (Id.).  The court allowed the question.  (Id.).  Plaintiff's counsel then showed defendant the informed consent form plaintiff had signed, which revealed that plaintiff had not been informed that the collapse or movement of the fracture was a risk of the procedure.  (Id.).

After asking that question, plaintiff's counsel immediately asked the defendant whether "after two days of listening to the testimony, are you now suggesting to the jury that one of the things you took into consideration when you removed that nail on April the 8[th] was that you wanted to promote healing at that point by dynamizing the fracture site?"  (Id. at 45).  Dr. Respet agreed that he had testified to that.  (Id.).  Plaintiff's counsel then read portions of Dr. Respet's deposition, suggesting that he had earlier testified that removal of the screw had occurred because Respet "felt that the locking screw was producing interference with soft tissue motion in his knee and I felt it would have to be removed at some point to try to relieve some of his pain."  (Id. at 47).  A report on the April 8 surgery Dr. Respet prepared also did not mention a desire to "dynamize" the site, but simply mentioned the pain of which plaintiff complained.  (Id.).

The parties' dispute here is over whether the evidence in the consent form was relevant to the case.  Defendant Respet contends that the informed consent form was relevant only to the question of whether plaintiff had been properly informed of the risks of his surgery.  Since no claim of lack of informed consent

exists, the evidence was irrelevant and likely to prejudice the jury. Plaintiff counters that the evidence was relevant to the question of the reason why Dr. Respet performed the surgery on April 8. Moreover, plaintiff contends that Dr. Respet offered inconsistent testimony on his reasons for performing the surgery, and the consent form is therefore relevant to the whether he had actually performed the surgery for the reasons stated at trial.

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determine of the action more probable or less probable than it would be without the evidence." Relevant evidence is generally admissible, though Federal Rule of Evidence 403 establishes that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." While such evidence may cause a jury to conclude that Defendant Respet behaved in an improper manner, such evidence is not prejudicial merely because a jury may use it to find in the plaintiff's favor. See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1344 n.6 (3d Cir. 2002) (holding that "any evidence that tends to harm a party's case could be said to prejudicial. Thus the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403."). "Rule 403 necessarily requires that the

District Court engage in balancing to determine whether the probative value of the evidence is 'substantially outweighed' by the negative factors listed in Rule 403." Id. In performing this balancing, "'the proper equation places on one side the maximum reasonable probative force for the offered evidence,' while 'the other side of the equation should include the likely prejudicial impact of the evidence.'" Id. (quoting Federal Rules of Evidence Manual 242 (Stephen A. Saltzburg et al., eds., 7th ed. 1998)).

Defendant Respet is correct in arguing that plaintiff did not raise a claim related to informed consent, and that if the evidence of the consent form were offered to prove that plaintiff did not give proper consent for the April 8 surgery it would be irrelevant. The evidence was offered for a different purpose here, however. The evidence of the form was relevant to the question of why Dr. Respet had performed the surgery. The fact that the informed consent form did not make mention of dynamizing the fracture or the risks that would follow from the failure of the fracture to heal makes it more likely that Dr. Respet performed the surgery to relieve the pain caused by the screw he inserted in the original surgery, which protruded from the fracture into soft tissue. Moreover, because Dr. Respet offered inconsistent explanations of his decision to perform the surgery and his deposition and the content of the consent form are relevant to the question of whether defendant's testimony at trial was credible. As such, the admission of the evidence was not in error, and the court will deny the motion on those grounds. Moreover, the

evidence was not unduly prejudicial.  The evidence was probative of an important question in the litigation.  The prejudicial effect from the evidence was not undue, as the plaintiff used the evidence only to address the relevant question, and defense counsel was able to address Dr. Respet's reasons for removing the screw on redirect.

Next, defendants assert that the court erred in refusing to grant a mistrial when the plaintiff's counsel asked Dr. Respet about x-ray films of another of his patients and Dr. Respet's treatment of that patient.  Defendants allege that the questions intimated to the jury that Dr. Respet faced another medical malpractice suit, and that these questions were highly prejudicial and irrelevant to the case. Defendants concede that the court attempted to minimize any prejudice through a curative instruction to the jury, but insist that the question asked by plaintiff's attorney was so inherently prejudicial that no cure was possible.

During the trial on this matter, plaintiff's counsel cross-examined defendant on his treatment of plaintiff.  (Transcript of Proceedings Held October 30, 2008 (Doc. 98) (hereinafter "T. Vol. III) at 37).  During this cross-examination, counsel asked defendant about his past treatment of a particular patient.  (Id.).  Defendant had earlier testified that he usually placed screws above and below the line of a fracture to increase stability, and plaintiff's counsel showed defendant an x-ray of a patient where the defendant had not used such screws.  (Id. at 37, 39). Defense counsel objected to the use of this patient's name, arguing at sidebar that use of the patient's

name violated federal medical privacy rules. (Id. at 37-38). Defense counsel agreed not to use the former patient's name and instead to "just talk generically." (Id. at 38). The court then sustained the objection and ordered plaintiff's counsel to re-phrase the question. (Id.). Plaintiff's counsel then asked Dr. Respet if he had treated a patient with a similar injury about a year after his treatment of plaintiff. (Id.). Counsel showed defendant an x-ray of that patient's leg. (Id. at 39). Dr. Respet admitted he had not put any locking screws in the tibia to secure the fracture. (Id.). Plaintiff's counsel then asked defendant whether "as a result of doing that, the nail ended up in the knee joint and you were sued." (Id.).

Before defendant could answer, his counsel objected on the grounds that the question was irrelevant. (Id.). Without waiting for a ruling from the court, plaintiff's counsel rephrased his question to ask "[D]id the nail end up in the knee joint?" (Id.). Defense counsel objected on the grounds that "[i]t's irrelevant. Whether he was sued or not is irrelevant." (Id.). The court asked the defense counsel if he was then "withdrawing [his] objection[?]" Defendant's responded "No. My objection stands. The court then ordered plaintiff's counsel to "[r]ephrase the question." (Id.). Plaintiff's counsel again asked defendant if the nail had ended up in the knee joint, and the court ordered "[s]ustain the objection. Rephrase the question." (Id. at 40). Questioning then continued by attorneys for both sides on the success of Dr. Respet's treatment of the patient. (Id. at 40-49). Dr. Respet never answered the question of whether he was sued over his treatment.

After testimony in the case concluded, the court held an *in camera* conference with the lawyers to address jury instructions.  (Id. at 51-63).  After ruling on jury instructions, the court discussed the potential prejudice caused by the question of whether Dr. Respet had been sued with the parties.  The defendant demanded a mistrial, arguing that the prejudice created by the question could not be overcome.  (Id. at 62).  Defendant had not demanded a mistrial at the time plaintiff's counsel asked this question, and had not even asked for a conference at sidebar.  The court denied defendant's motion for a mistrial, noting that the court did not admit any evidence regarding this lawsuit and instructed the jury to disregard such testimony.  (Id.).  Plaintiff's counsel suggested that the court should instruct the jury to ignore the question.  (Id. at 62).  Defense counsel insisted on a mistrial.  (Id.).  When the court informed the lawyers that "I don't want to bring more attention to", defense counsel interrupted, noting that "I understand what you're saying[,] [a] mistrial has been denied, but if your Honor is going to instruct the jury to disregard that, then that is okay."  (Id. at 63).  Still, defense counsel insisted that "I don't think I can overcome that type of information."  (Id.).  The court again asked the lawyers if they wanted him to instruct the jury accordingly.  (Id.).  Only plaintiff's counsel responded, stating "Yeah.  I think we should do that."  (Id.).

After this discussion, the court addressed the issue for the jury, informing the panel that "[t]his morning on cross examination of Dr. Respet there was a reference to some other lawsuit and I sustained that objection."  (Id. at 63).  The court

19

"instruct[ed] the jury to totally disregard that question, that any of that subject has nothing to do with this lawsuit. Totally disregard it." (Id.). The court then polled the jury, inquiring whether each member could "disregard [the question] and follow my instructions." (Id.). All fourteen jurors informed the court that they could ignore the question. (Id. at 63-65).

Defendant argues that the court erred in refusing to grant a mistrial after this questioning, since the question attempted to elicit highly prejudicial evidence. Defendant argues that this evidence of a prior lawsuit was not admissible as it was not relevant to the questions at issue in this case. He cites to Weil v. Seltzer, 873 F.2d 1453 (D.C. Cir. 1989), a case in which the District of Columbia Circuit Court of Appeals vacated the judgment of the district court because the court had improperly admitted testimony from five of the defendant-doctor's former patients about his treatment of them as "habit" evidence pursuant to Federal Rule of Evidence 406(b). Id. at 1460; see also FED. R. EVID. 406 ("Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."). The court found that evidence of the treatment of five former patients "is not of the nonvolitional, habitual type that ensures its probative value. Rather the former patient evidence is the type of character evidence contemplated under Rule 404 (b)," which prohibits use of "[e]vidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show action in conformity

therewith." Id. at 1461; See also FED. R. EVID. 404(b).

The court agrees with the defendants that a mistrial may have been

appropriate had the jury been permitted to hear evidence of other lawsuits brought

against him for conduct similar to the conduct plaintiff complained of here.[2]  This

case is much different from Weil, however.  In that case, the judge allowed the

plaintiff to present evidence of the defendant's prior acts, and the Court of Appeals

concluded that this evidence was introduced to prove action in conformity therewith.

Here, the court prevented the plaintiff from introducing evidence of prior acts,

sustaining an objection to a question about an earlier lawsuit.  The defendant never

answered that question.  The court addressed to the jury the problem caused by this

question, and polled the jurors about whether they could put the implications it raised

out of their mind.

Still, the defendants contend that they were prejudiced by this question, and

that the court's instruction failed to cure the prejudice.  Courts presume that jurors

follow their instructions.  Even in the criminal context, "'[w]e must presume that a jury

will follow an instruction to disregard inadmissible evidence . . . unless there is an

---

[2]Defendants apparently do not complain about admission of the x-ray or a discussion of his treatment of the earlier patient, just about the effect of asking a question about the lawsuit that treatment may have caused.  In any case, the evidence about the prior treatment did not in itself draw an objection, presumably because defense counsel concluded the evidence was admissible for impeachment pursuant to Federal Rule of Evidence 608(b).

overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the impact of the evidence would be devastating to the defendant.'" United States v. Vaulin, 132 F.3d 898, 901 (3d Cir. 1997) (quoting U.S. v. Thornton, 1 F.3d 149, 157 (3d Cir. 1993)). While plaintiff's counsel's question was admittedly inappropriate, the court gave a curative instruction, and the jurors all reported that they could ignore the question. No evidence indicates that this unanswered question created an "overwhelming probability" that the jurors could not follow the court's instructions, and the court concludes that the jurors reached their verdict based on the evidence presented in the case. The court will therefore deny the defendants' motion on these grounds.

As a third ground for a new trial, defendants argue that plaintiff's evidence on damages was "inherently speculative" and not supported by sufficient evidence. Plaintiff's expert testified about how much plaintiff would have earned had he worked for a private aviation company, even though he had never performed such work and never sought such work. This testimony, defendant argues, should have been disregarded. Failure to limit such testimony, defendants contends, provides grounds for a new trial. In the alternative, defendants seek remittitur from the court, arguing that the damages awarded by the jury were based on passion or prejudice, not the facts established at trial.

Robert Wolf, Ed. D., testified by deposition at trial as an expert on plaintiff's vocational damages. Dr. Wolf testified that he had prepared two different economic

22

analyses of plaintiff's vocational limitations and economic losses. (Deposition of Robert P. Wolf (Doc. 101) (hereinafter "Wolf Dep. T.") at 23). Wolf based his analyses on "two alternative estimates" of plaintiff's earnings in his job as a pilot (Id. 23). The first alternative considered "the average of [plaintiff's] earnings a few years prior to the incident." (Id.). Plaintiff had worked since 1988 as a helicopter medevac pilot since 1988. (Id. at 15). Wolf's estimate yielded an average earnings of $58,597 per year. (Id. at 23). Wolf's second estimate considered plaintiff's average earnings if he had decided to work in a corporate setting instead of the hospital where he had always worked as a pilot. (Id.). This estimate yielding an earnings potential of $100,000 a year. (Id. at 24). After subtracting for plaintiff's continued earning potential of $26,000 a year and performing other calculations to account for lost fringe benefits, Dr. Wolf established estimates of plaintiff's past and future lost earnings. (Id. at 34). Using the number for plaintiff's actual earnings, Dr. Wolf estimated his loss at $640,496. (Id.). Using the larger number for earnings as a corporate pilot, Dr. Wolf estimated plaintiff's loss at $1,154,730. (Id.).

During cross-examination, defense counsel asked Dr. Wolf if plaintiff had ever worked as a corporate pilot, and whether Wolf had "any indication that he was going to stop working" in his position at the hospital. (Id. at 41). Wolf responded that "[i]t was represented to me that he was aware of alternative opportunities in the private corporate sector. And that he was interested in pursuing those opportunities based on his perceived higher wage rate." (Id.). Defense counsel pointed out that plaintiff

had long been aware of the higher pay available to pilots in other sectors, but had not done anything to seek such employment before his injury.  (Id. at 42).  Thus, counsel insisted, "if we look at Mr. Boernert, the most reflective numbers for him are what he actually did."  (Id. at 41).   Dr. Wolf argued that those numbers "would not represent his earning capacity," since earning capacity "is what you can realistically do if you choose to pursue those opportunities.  The choice was his to pursue or not pursue."  (Id. at 42).

Courts have held that "a District Court in reviewing a jury verdict has an 'obligation . . . to uphold the jury's award if there exists a reasonable basis to do so.'" Evans v. Port Auth. Of N.Y. & N.J., 273 F.3d 346, 351 (3d Cir. 2001) (quoting Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989)).  "The jury's verdict may not be disturbed unless the record is critically devoid of the minimal amount of evidence upon which the jury could have reached its verdict."  Feldman v. Philadelphia Hous. Auth., 43 F.3d 823, 833 (3d Cir. 1994).  A court may not alter an award "merely because it would have granted a lesser amount of damages."  Evans, 273 F.3d at 352.  (citation omitted).  "A new trial is warranted based 'upon [a] showing that 'the jury verdict resulted from passion or prejudice.'"  Id. (quoting Hurley v. Atlantic City Police Dept., 174 F.3d 1371, 1383 (3d Cir. 1999)).  The mere presence of a large award, however, is insufficient "to prove prejudice and passion." Id.

The jury verdict broke down plaintiff's damages into past medical expenses,

past economic harm for loss of earning capacity and household expenses, past non-economic harm for pain, mental anguish, discomfort, inconvenience and distress, future economic harm, and future pain and suffering. (Jury Verdict (Doc. 74)). The jury concluded that plaintiff was entitled to $250,000 in past economic damages and $400,000 in future economic damages. These numbers closely track the lower of the two estimates that Dr. Wolf provided, numbers based on plaintiff's actual earnings as helevac pilot for the hospital. Dr. Wolf provided the jury with the basis for this opinion, which included plaintiff's reports of these earnings, Dr. Wolf's assessment of how much plaintiff could earn in his reduced physical condition, and the needs of his household. Contrary to defendants's position, then, the verdict was not speculative or governed by the jury's passion or prejudice, but based on the testimony Dr. Wolf provided. The record clearly contains the evidence the jury used to establish plaintiff's economic damages, and the jury awarded the plaintiff economic damages that mirrored the lower of the two numbers the expert provided. Indeed, the jury appears to have adopted the position that defense counsel took during the expert testimony, rejecting the idea that plaintiff's recovery should be based on the possibility that he could have earned more money as a corporate pilot than he did in the job he held for more than fifteen years. The court will therefore deny defendants's motion for a new trial on damages. Because the jury's verdict had a reasonable basis in the facts established at trial, the court will also deny the defendants' motion for remittitur.

**b. Plaintiff's Motion**

Plaintiff's motion seeks delay damages pursuant to Pennsylvania Rule of Civil Procedure 238. That rule provides that "[a]t the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury." PA. R. CIV. P. 238(a)(1). Under the rule, damages are "awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision." PA. R. CIV. P. 238(a)(2). "The purpose of this rule is to alleviate delay in the courts by providing an incentive and encouragement for defendants to settle meritorious claims as soon as reasonably possible." Krebs v. United Ref. Co., 893 A.2d 776, 794-95 (Pa. Super. Ct. 2006).

Here, the parties agree that plaintiff is entitled to delay damages, but disagree about when the court should begin to calculate those damages. The record reflects that plaintiff filed his original complaint in the United States District Court for the Eastern District of Pennsylvania on August 11, 2005. (See Doc. 1). The original complaint named as Defendant Alpine Mountain Corporation. (Id.). Plaintiff served this complaint on August 31, 2005. (Id.). Plaintiff filed an amended complaint which named as defendants Patrick B. Respet and Othopaedic Associates of Allentown, Ltd. (Id.). He received summons from this court on February 17, 2006, and

Defendants Respet and Othropaedic Associates filed a motion to dismiss the complaint on February 22, 2006. (Doc. 3). Plaintiff filed proof of service with this court on March 13, 2006, reflecting that the complaint had been served on March 8, 2006. (Doc. 7).

Plaintiff argues that this court should calculate delay damages beginning from one year after the date of service of the original complaint, or September 1, 2006. Defendants argue that the court should not begin to calculate delay damages until the plaintiff added them to the case and served them with the complaint. Under this rule, they argue, delay damages should be measured from March 8, 2007. They point to rule 238(b)(1)(ii), which provides that the calculation of delay damages shall exclude any time "during which the plaintiff caused the delay of the trial." PA. R. CIV. P. 238(b)(1)(ii). Because defendants were not served, they argue, they should not be charged for delaying trial and a verdict in this case.

Neither side has pointed the court to any case law that addresses the issue of when the court should begin to calculate delay damages against a defendant who was not added to the case until after the original filing of the complaint. The court has not discovered any cases that address this issue. The 1988 Explanatory Comments to Rule 238, however, emphasizes that "damages for delay are calculated from the date one year after original process is first served in the action." PA. R. CIV. P. 238 Explanatory Comment–1988. The note goes on to explain how the rule is to work:

> [A]ssume a cause of action for negligence arising on August 7, 1988. Plaintiff sues Defendants A and B on August 8, 1989. Original process is served on Defendant A on August 30, 1989 and on Defendant B on December 1, 1989. Defendant A then joins Additional Defendant C on August 6, 1990 . . . If damages for delay ultimately are awarded to Plaintiff, they will be assessed against Defendants A and B and against Additional Defendant C from August 30, 1990, one year after the date original process was served in the action.

Id.

This comment to the rule makes it clear that delay damages should be calculated from service of the original cause of action, regardless of when a defendant required to pay delay damages was served with the complaint. Plaintiff is correct to point out that "delay damages are not to be awarded for any period 'during which the plaintiff caused *delay of the trial*." Costa v. Lauderdale Beach Hotel, 626 A.2d 566, 570 (Pa. 1993) (emphasis added). Defendants' complaint is that since the plaintiff did not serve them at the time of the original complaint, that this delay was plaintiff's fault. Thus, defendants argue, the time between service of the original complaint and service on these defendants should not be factored into the delay damages calculation. Defendants do not argue, however, that the delay in service delayed the *trial*, and rule 238(b)(1)(ii) does not apply.[3] See, e.g., Wirth v. Miller, 580 A.2d 1154, 1159 (Pa. Super. Ct. 1990) (finding that "the plain language of Rule 238 makes clear that plaintiff's conduct will affect the delay damage award only where his or her conduct 'caused the delay of *trial*.'") (quoting Schrock v. Albert Einstein

---

[3]The record reflects as well that defendants filed a motion to dismiss the complaint before they were served with it, indicating that concerns about whether defendants were aware of the complaint may be misplaced.

28

Medical Center, 562 A.2d 875 (Pa. Super. Ct. 1989)) (emphasis added).  The court

will therefore calculate the delay damages from one year after service of plaintiff's

original complaint.

Plaintiff also seeks to correct the verdict entered against Defendant Respet to

include Defendant Orthopaedic Associates as a judgment defendant.  In this case,

the parties agreed that Defendant Orthopaedic Associates would be vicariously

liable for any judgment against Defendant Respet.[4]  Through an oversight, however,

the verdict slip entered by the court did not include Orthopaedic Associates.  To

correct this admission, the court will order the judgment corrected to reflect

Defendant Orthopaedic Associates' liability.  See Fed. R. Civ. P. 60(a) (establishing

that "[t]he court may correct a clerical mistake or a mistake arising from oversight or

omission whenever one is found in a judgment, order, or other part of the record.").

Defendants do not contest that plaintiff is entitled to post judgment interest

from the date of the verdict until the satisfaction of judgment pursuant to 28 U.S.C. §

1961.  The court will therefore grant the plaintiff's motion on this point.

**Conclusion**

For the reasons stated above, the defendants' post trial motions will be

denied, and the plaintiff's post-trial motions will be granted.  An appropriate order

---

[4]Indeed, the parties apparently also agreed that Defendant Orthopaedic Associates did not need to be named on the verdict slip.  They have now changed their positions on the matter.  To ensure that liability is properly assigned, the court will consider the omission of Orthopaedic Associates from the verdict an oversight.

29

follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WOLFGANG S. BOERNERT** | : | **No. 3:06cv362** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **ALPINE MOUNTAIN CORPORATION,** | : | |
| **PATRICK B. RESPET, M.D., and** | : | |
| **ORTHOPAEDIC ASSOCIATES OF** | : | |
| **ALLENTOWN, LTD.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

**AND NOW**, to wit, this 18th day of June, 2009, Defendants' Patrick Respet

and Orthopaedic Associates of Allentown's motions for post-trial relief (Docs. 79, 82,

99) are hereby **DENIED**.  Plaintiff's motion to amend/correct the judgment (Doc. 76)

is hereby **GRANTED**.  Delay damages of $347,060.43 shall be added to the jury's

verdict of $1,840,564.00 awarded to the plaintiff on October 30, 2008.  The total

judgment in plaintiff's favor shall amount to $2,187,624.43, together with judgment

interest at the appropriate rate from October 30, 2008 until the judgement is

satisfied.  The Clerk of Court is hereby **ORDERED** to amend the judgment to reflect

the vicarious liability of Defendant Orthopaedic Associates of Allentown, Inc.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**